IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
(COLUMBIA DIVISION)

| | | |
|---|---|---|
| The Benedict College, | ) | Case No.: 3:08-cv-02520-JFA |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| National Credit Systems, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | _____ |

**DEFENDANT NATIONAL CREDIT SYSTEMS, INC.'S RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT OF CROSS MOTION FOR PRELIMINARY INJUNCTION**
_____

**I.    INTRODUCTION**

Defendant National Credit Systems, Inc. ("NCS") submits this response to Plaintiff Benedict College's ("Benedict") Motion for Preliminary Injunction, filed August 24, 2009. For the reasons set forth herein NCS requests this Court deny Benedict's Motion, and in the alternative, if the Court deems an injunction necessary, that the Court order Benedict to maintain all funds collected on the accounts at issue in this case in escrow pending the final resolution of this case.

**II.    BACKGROUND**

NCS is a business specializing in the collection of debts. On May 18, 2007 Benedict entered into a agreement with NCS for NCS to collect on approximately 5000 student loan debts known as Gap Loans. See NCS Print Order Agreement dated May 18, 2007 (hereinafter "NCS Agreement"), attached as Exhibit 1. This is the only agreement NCS entered into with Benedict College. No one at NCS, Inc., New York, NY has ever seen the purported addendum signed by sales trainee Darren

1

Ford, which Benedict claims is part of the agreement between the parties. See Deposition of Chris Rehkow 44-46, August 19, 2009 (identifying the first two pages of Exhibit 5 as the Standard NCS agreement between the parties) (relevant excerpts attached as Exhibit 2); see also, Deposition of Eric Snyder, 105-108, August 20, 2009 (identifying the first two pages of Exhibit 3 as the Standard NCS Agreement between the parties) (relevant excerpts attached as Exhibit 3) .

In exchange for payment of $255,000 ($51 per account), NCS would provide Level III B services, which consists of a certain number of calls and letters to each debtor during a specified time frame, for each of the accounts submitted. The NCS Agreement provides for a 400% Guarantee of the initial cost (4 times $255,000= $1,020,000) in collections within the first 90 days of collection, subject to the Terms and Conditions, or Benedict may submit for a refund of the $255,000 fee. The Terms and Conditions of the NCS Agreement (page 2) provide, *inter alia*:

> You must submit to NCS qualifying accounts equal to the total number of Claim Forms in the system [5000 in this case]. NCS reserves the right to verify refund eligibility. If upon applying for a refund you are determined to be ineligible, NCS will continue working more accounts for free until the 400% return on investment is achieved.
>
> Accounts that qualify must be (1) persons or companies that legally owe you at least five times NCS's fee per claim form [5 times $51= $255], that are not contested, and are also (2) contactable by mail and or phone through information furnished by you. . . . Non qualifying accounts are those where prior legal action was taken or where accounts where judgments have been obtained, bankruptcies, and accounts which are past due twelve (12) months since last payment or charge. This written guarantee constitutes the entire agreement between the parties and cannot be changed except in writing by the parties.

Ex. 1, p. 2; see also Ex. 2, Dep. of C. Rehkow 50-57.

Further, the NCS Agreement provides for two phases of service. The Primary Phase consists of the first 120 days where upon the initial Level III B service is provided. The Secondary Phase

consists of placement with the American Credit Management Division ("ACM") whereupon more intense steps are taken to collect on the debt, including litigation, when warranted. Under the NCS Agreement, Benedict agreed to ACM automatic transfer authorization after first 120 days of collections. Once an account is transferred to the Secondary Phase NCS is entitled to a 50% contingency fee for the ACM services. The agreement provides:

> ACM will process all debtor payments and remit a check each month to Client (less collection fees charged as specified- usually 50%"); along with a statement detailing all transactions processed. ACM is entitled to full commissions on all monies recovered, whether paid directly to ACM or directly to client.

Ex. 1, p. 2. The agreement continues:

> ACM will charge a 50% fee on accounts forwarded to a collections attorney for litigation, skips/mail returns, . . . NSF checks, accounts with balances less than $100, accounts previously worked by another collection agency (secondary placement), and accounts past due over twelve months since last payment or charge.

Ex. 1, p. 2. Importantly, the NCS Agreement provides:

> ***It is agreed and understood that if an account is settled directly with Client or withdrawn by Client for any reason, client will immediately send ACM its full fee. Client agrees that the full ACM fee must be paid to effect the withdrawal of any claims.***

Ex. 1, p. 2 (last paragraph)(emphasis added).

In July of 2007 Benedict submitted approximately 3300 accounts for collection to NCS (1700 short to qualify for any guaranteed amount). The total amount of accounts receivables submitted was $21,905,101.76. Many of the accounts submitted were older than 12 months since last payment or charge and many were more than 3 years since the last payment (again not qualifying for purposes of any guarantee). See Ex. 2, Dep. of C. Rehkow 50-57. Nonetheless, in November 2007 Benedict began making demands for payment of the guaranteed amount. Benedict subsequently filed suit in

3

May 2008 seeking payment of the guaranteed amount.

In June 2008 Benedict sent a letter to NCS purported to withdraw the claims from NCS's collection services. See Pl's. Mot. for Preliminary Injunction (Attachment A). In making its demand for withdrawal, Benedict conveniently ignored the contractual term that required the payment of the ACM fee to effect withdrawal (in this case $10,952,500.88) as required by the NCS Agreement. See Ex. 1 ("Client agrees that the full ACM fee must be paid to effect the withdrawal of any claims."). This contractual provision is intended to provide NCS security for payment of its contractual ACM fee by allowing NCS to continue to collect on the accounts receivable submitted, rather than just the creditworthiness of the client withdrawing the claims. The payment of the ACM fee effective upon withdrawal is the primary basis for NCS's counterclaim against Benedict.

By way of this Motion, Benedict seeks to enjoin the very activity it expressly authorized NCS to perform by way of the NCS Agreement, and further seeks to have the Court aid it in ignoring the contractual provision that requires payment of the full ACM fee (50%) prior to effecting the withdrawal of the claims. Benedict does so relying upon hearsay testimony and unauthenticated documentation allegedly received from one of the 3,322 Benedict debtors.

### III.   DISCUSSION

Plaintiff has failed to meet its burden of establishing that it is entitled to a preliminary injunction from the Court. "[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." MicroStrategy Inc. v. Motorola Inc., 245 F.3d 335 (4th Cir. 2001) (internal quotation marks omitted). "Because a preliminary injunction affords, on a temporary basis, the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by 'a clear

4

showing' that, among other things it is likely to succeed on the merits at trial." Real Truth about Obama, Inc. v. Federal Election Commission, 575 F.3d 342, 345-346 (4th Cir. 2009)(quoting Winter v. Natural Resources Defense Council, Inc.,—U.S.—. 129 S. Ct. 365, 376 (2008)) (further citations omitted). In Winter, the Supreme Court recently articulated what a party must establish in order to obtain a preliminary injunction. Id. at 346. Prior to Winter, the Fourth Circuit followed a "balance-of-the-hardship test" which it adopted in Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir. 1977). Id. Winter has now called into question the fate of the "balance of the hardship test" adopted in Blackwelder. Id. at 347. Thus, in Real Truth about Obama, Inc., the Fourth Circuit reviewed the district court's denial of the appellants' preliminary injunction under the standard pronounced in Winter. Id.

> Under Winter, the Supreme Court
>
> stat[ed] that the plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." ***And all four requirements must be satisfied***.

Id. at 346 (emphasis added) (quoting Winter, 129 S. Ct. at 374).

Thus, under the Supreme Court's standard announced in Winter, the party seeking a preliminary injunction must first "make a clear showing that it will likely succeed on the merits at trial." Id. (citing Winter, 129 S. Ct. at 376). Next, the party must "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." Id. at 347 (citing Winter, 129 S. Ct. at 374-376). Third, "the Supreme Court emphasized the public interest requirement, stating, 'In exercising their sound discretion, courts of equity should pay *particular regard* for the public consequences in employing the extraordinary remedy of injunction.'" Id. at 347 (quoting Winter, 129 S. Ct. at 376-

5

377). Finally the standard for obtaining injunctive relief pronounced in Winter differs from Blackwelder in that it "articulates four requirements, each of which must be satisfied as articulated." Id. at 347.

Thus, under Winter, Benedict must: (1) make a clear showing that it is likely to succeed on the merits; (2) demonstrate that it will be irreparably harmed if the injunction is denied; and (3) demonstrate that the injunction it seeks is in the public interest. See e.g. id. at 347.

**A.     Benedict has failed to make a clear showing that it is likely to succeed on the merits at trial.**

In its Motion, Benedict stated that "[n]either party disputes that Benedict directed NCS to cease all collections efforts on Benedict loan accounts not later that [sic] June 8, 2008." Pl's Mot. for Preliminary Injunction 7. This can hardly be considered a "clear showing" that Benedict is likely to succeed on the merits at trial on its claims for breach of contract, unjust enrichment, fraud and fraud in the inducement. Rather, this is only evidence that Benedict attempted to effect the withdrawal of the claims without abiding by the contractual provision that Benedict remit the ACM fee that was due.

Benedict's contention is irrelevant to the Court's analysis. The "merits" of the suit are the underlying claims alleged in the Plaintiff's Complaint. See Real Truth about Obama, Inc., 575 F.3d at 347-348 (likelihood of success on the merits depended on Plaintiff's ability to succeed on the underlying challenge to the constitutionality of three Federal Election Commission regulations); see also, MicroStrategy Inc. v. Motorola Inc., 245 F.3d 335, 340(4th Cir. 2001) (Plaintiff had the burden of demonstrating that it was likely to succeed on the underlying trademark infringement claim against Defendant).

Benedict has failed to demonstrate a strong likelihood of success as to its claims for breach of contract, fraud, fraud in the inducement and unjust enrichment. As described early Benedict has brought a claim for payment of the Guaranteed Amount, even though many of qualifying terms of the guarantee were not met by Benedict. For example, Benedict only submitted 3,322 accounts (5000 was required), most of which were older than 12 months (in violation of guarantee provisions), and many of which were beyond the three year statute of limitations and thus legally unenforceable. Benedict's likelihood of success on the merits of these claims is tenuous at best. Further, Benedict's claims for fraud and fraud in the inducement do not satisfy the threshhold requirements of Rules 9 and 12 of the Federal Rules of Civil Procedure and are subject to dismissal by this Court. See NCS's Motion for Judgment on the Pleadings (Docket Entry # 30).

As previously stated, the Supreme Court's standard for granting preliminary injunctions requires the court to find that Plaintiff "make a clear showing" with respect to its likelihood of success on the merits. Real Truth about Obama Inc., 575 F.3d at 346 (citing Winter, 129 S. Ct. at 376). "Any relaxation of its burden, for example to require that [Plaintiff] show only a *possibility* that it will eventually prevail, would be inadequate." Id. at 349. (citations omitted). Thus, Benedict has failed to carry its burden of establishing its likelihood of success on the merits.

Conversely, NCS will likely prevail on its claim for breach of the NCS Agreement due to Benedict's breach thereof. It is undisputed that Benedict submitted 3,322 accounts (totally receivables of approximately $22 million) to NCS in July 2007, and that Benedict attempted to withdraw these claims in June 2008, without payment of the contractually required ACM Fee. See Benedict's Complaint ¶ 10 (submission of 3,322 accounts) and Pl's. Mot. for Preliminary Injunction 2 (referencing June 9, 2008 Corr. from B. Walker (Benedict) to F. Wright (NCS) withdrawing

accounts). Thus, the likelihood of success on the merits as to NCS's counterclaim is significant.

Since Benedict has failed to make a clear showing that it is likely to succeed on the merits, and since NCS will likely prevail on the merits of its counterclaim based upon the express provisions of the agreement at issue, the Court should deny Benedict's Motion for a Preliminary Injunction.

  **B.**   **Benedict has failed to demonstrate that it will suffer irreparable harm if its Motion for a Preliminary Injunction is denied.**

Benedict claims it will suffer irreparable harm to its reputation, goodwill and student and alumni relations if an injunction is not issued. However, Benedict has failed to show any *immediate* threat of loss of reputation, goodwill or harm to its student and alumni relations. See e.g. In re Microsoft Corporation Antitrust Litigation, 333 F.3d 517, 530 (4th Cir. 2003) ("The very function served by requiring a clear showing of irreparable harm that must be actual and imminent rather than remote [and] speculative is to limit the deployment of the heavy artillery of preliminary injunctive relief to situations in which it is readily apparent to the court that such relief is actually necessary to prevent a harm from occurring.") (internal quotations and citations omitted); Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 816 (4th Cir.1991)(reversing district court's grant of a preliminary injunction based on lack of immediacy of threat of irreparable harm).

Moreover, "the Court in Winter rejected a standard that allowed the plaintiff to demonstrate only a 'possibility' of irreparable harm because that standard was 'inconsistent without characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" Real Truth about Obama, Inc., 575 F.3d at 346 (quoting Winter, 129 S. Ct. at 375-76). Winter rejected the Blackwelder balancing of the harms test and requires "that the plaintiff make a clear showing that it is likely to be irreparably harmed absent

preliminary relief." Id. at 347 (citing Winter, 239 S. Ct. at 374-76). Winter also rejected the Blackwelder standard which "allows that upon a strong showing on the probability of success, the moving party may demonstrate only a possibility of irreparable injury." Id. (citing Winter, 129 S. Ct. at 375-76.)

Benedict's sole basis for seeking injunctive relief is founded upon the Declaration of Taranne Roberts. In her Declaration, Ms. Roberts described two instances, over a period of fifteen months, where NCS attempted to collect on outstanding accounts of Benedict College. See Pl's Motion for Preliminary Injunction (Exhibit 1) (Declaration of Taranne Roberts ¶¶ 6-8 (notably much of her affidavit is inadmissable hearsay)). However, Benedict has offered no proof that its reputation or goodwill has been negatively affected among its students, alumni or in the community. Ms. Roberts' Declaration demonstrated no immediate threat of loss of students or business relationships as a result of NCS' collection efforts. There is no evidence before this Court of even a single untoward interaction between NCS and the Benedict debtors. Put simply, the affidavit of Ms. Roberts only evidences the obvious, that Benedict would prefer to keep the money it contractually pledged to NCS as part of its collection efforts. Benedict only shows that NCS has continued its collection efforts, on a very limited scale (contact with 2 debtors), pursuant to its obligations under the NCS Agreement and in an effort to mitigate its own damages. Benedict has failed to demonstrate that irreparable harm is likely, not just possible. Any alleged threat of harm to Benedict's reputation and goodwill is speculative and remote, at best.

As previously stated, an injunction is an "extraordinary remedy" requiring the threat of irreparable harm to be immediate versus possible. Benedict has failed to show an immediate threat to its business reputation and goodwill, therefore NCS requests that the Court deny its Motion.

**C. If an injunction is issued, NCS will suffer an immediate threat of irreparable harm.**

Under the NCS Agreement, Benedict elected to participate in the Cash Recovery System's Secondary Phase, the ACM phase. As such, Benedict agreed to the following Terms and Conditions: "It is agreed and understood that if an account is settled directly with Client or withdrawn by Client for any reason, Client will immediately send ACM its's full fee. Client agrees that the full ACM fee must be paid to effect the withdrawal of any claims." Ex. 1, p. 2.

On June 8, 2008, Benedict sent a letter to NCS requesting that it cease all collection efforts. NCS interpreted this letter as a withdrawal letter under the NCS Agreement. See Ex. 2, Dep. of C. Rehkow 19:19-20. Pursuant to the NCS Agreement, Benedict was to pay the full ACM fee to effectuate the withdrawal of any accounts in the ACM Secondary Phase, said fee totaling $10,952,550.88. To date, Benedict has failed to remit payment for the ACM fee. Thus, NCS has a contractual right to continue collecting on the accounts remitted to the ACM Secondary Phase pursuant to the agreement between the parties. If the Court issues an injunction preventing NCS from collecting on these accounts, NCS will may suffer financial loss. Such losses are contemplated in the agreement, which is why NCS insists on those terms providing it continued security for its ACM payment, by retaining a contractual right to continue to collect on accounts submitted to ACM phase until the ACM Fee is paid in full.

It is a well-established maxim that equity follows the law. See East Tennessee Natural Gas Co. V. Sage, 361 F.3d 808, 823 (4th Cir. 2004) ("A federal court has the power to grant equitable relief, but this power is circumscribed by the venerable principle that equity follows the law.") (Internal quotations and citations omitted). In this case, the relationship of the parties is governed by

the NCS Agreement. Thus, if the Court chooses to enjoin NCS from collecting on the outstanding accounts, NCS requests that Benedict be required to deposit the all amounts collected on the accounts submitted into an escrow account pending the outcome of the litigation. This would protect NCS' financial interests and preserve the status quo between the parties pending a trial on the merits.

### D. Benedict has not shown that the public interest will not be affected if it is granted a preliminary injunction.

Benedict's accusation that NCS' actions are "abhorrent to public policy" are wholly without merit and unfounded under the Winter analysis. Rather, Benedict must demonstrate that an injunction is not against the public interest. See Real Truth about Obama, Inc., 575 F.3d at 345. Benedict merely assumes that public policy would favor an injunction, yet it has offered no showing of how an injunction would not be against public policy.

The grant of a preliminary injunction, however, would affect the public interest. NCS is proceeding, albeit in a limited fashion, under the contract between the parties in an effort to mitigate its damages. Such action is not against public policy, instead, it is NCS' obligation under the agreement between the parties. The public interest will not be adversely impacted by NCS' collection efforts pursuant to the NCS Agreement as these are the same procedures used by any number of debt collection businesses, which Benedict expressly authorized NCS to perform.

Benedict's actions, however, in breaching the NCS Agreement, are contrary to the public interest and the integrity of contractual obligations. The public interest would not favor the grant of a preliminary injunction in this case, and the Court should deny Benedict's Motion for a Preliminary Injunction, or in the alternative, grant the alternative relief sought by NCS.

**IV.     CONCLUSION**

For the foregoing reasons, NCS requests that the Court deny Benedict's Motion for Preliminary Injunction as Benedict has failed to demonstrate, under the Winter analysis, that the balance of the equities warrants the extraordinary remedy of a preliminary injunction. In addition, in the event the Court determines that some action is necessary to protect both parties interests, NCS requests the Court grant its Cross Motion for Preliminary Injunction and order Benedict to deposit all sums collected on the 3,322 accounts at issue into an escrow account pending the outcome of the litigation, or for any other such relief the Court deems appropriate.

**FINKEL LAW FIRM LLC**
1201 Main Street, Suite 1800
P.O. Box 1799
Columbia, South Carolina 29202
(803) 765-2935
(803) 252-0786 fax


 /s/ Charles A. Krawczyk
Charles A. Krawczyk (Dist. Court ID:  9198)
*ckrawczyk@finkellaw.com*
William R. Padget (Dist. Court ID:  9466)
*bpadget@finkellaw.com*

Columbia, South Carolina
September 11, 2009