IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| The Benedict College, | ) | C/A No. 3:08-2520-JFA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| National Credit Systems, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

I.      Factual and Procedural Background

Plaintiff Benedict College ("Benedict") filed this action against defendant, National

Credit Systems, Inc. ("NCS"), alleging breach of contract, fraud, fraud in the inducement,

and unjust enrichment deriving out of its contract with NCS for NCS to collect on delinquent

loans Benedict issued its students.  Benedict contends that the contract is comprised of a two-

page document and a multi-page addendum signed by NCS agent Darren Ford ("Ford").

NCS disputes the validity of the addendum and claims that Ford lacked the authority to sign

it.  Benedict paid NCS $255,000, based on what it believed was a guarantee that NCS would

pay it a minimum of $1,020,000 within 120 days upon receipt of collections processed.  After

several months, Benedict terminated the contract with NCS on grounds that NCS failed to

perform or pay on its guarantee.  NCS denied the allegations and counterclaimed for breach

of contract, seeking over $10 million.  Subsequent to the court's issuance of a scheduling

order, the parties engaged in discovery, which led to the filing of the following motions:

1)  Benedict's Motion to Amend the Complaint to Add Defendants and Claims for Fraud and Civil Conspiracy filed 9/1/09 [dkt. # 32]

2)  NCS's Motion for Judgment on the Pleadings as to Fraud Claims and Punitive Damages filed 8/26/09 [dkt. # 30]

3)  NCS's Motion for Partial Summary Judgment as to Fraud Claims, Punitive Damages and Which Writing Constitutes the Contract filed 9/25/09 [dkt. # 45]

4)  Benedict's Motion to Compel filed 8/4/09 [dkt. # 26]

5)  Benedict's Motion for Preliminary Injunction filed 8/24/09 [dkt. # 27]

6)  NCS's Cross Motion for Preliminary Injunction filed 9/11/09 [dkt. # 38]

7)  Benedict's Motion for Independent Accounting filed 8/24/09 [dkt. # 28]

The court held a hearing on October 20, 2009 on the foregoing motions and heard argument from counsel. The court ruled orally on some matters and took under advisement the remaining issues. This order serves to memorialize the court's rulings.

II.  Discussion

A.  Benedict's Motion to Amend the Complaint

Benedict has moved for leave of court to amend its complaint to 1) add claims for civil conspiracy and accounting, 2) add as defendants NCS President Christopher Rehkow ("Rehkow") and NCS Account Representative Eric Snyder ("Snyder") in their personal capacities, and 3) change the basis of its claims for fraud and fraud in the inducement. NCS contends that the proposed amendment is untimely, prejudicial, costly, futile and frivolous and that the court lacks personal jurisdiction over Rehkow. Benedict contends that because it has just learned of the facts necessary to support these new claims and the addition of the

new defendants during discovery, the proposed amendment has not been unreasonably delayed, and that challenges to personal jurisdiction are not addressed at the amendment stage.

The original deadline in the scheduling order for amending the pleadings was September 19, 2008, despite the fact that discovery was not contemplated to end until June 5, 2009. In May 2009, Benedict attempted to schedule depositions for the week of June 1, 2009 and NCS asked for an extension of the discovery deadlines. In the amended scheduling order, discovery was extended to September 1, 2009.

"[W]hen a motion to amend the pleadings is filed after the scheduling order's deadline for amendments of pleadings has passed, a two-step analysis is required." *George v. Duke Energy Retirement Cash Balance Plan*, 560 F. Supp. 2d 444, 480 (D.S.C. 2008). "First, the party seeking the amendment must demonstrate to the court that it has a good cause for seeking modification of the scheduling order under Rule 16(b)." *Id.* "Second, the party seeking amendment must meet the requirements for amendment of pleadings under Rule 15(a)." *Id.* "The good cause requirement of Rule 16(b) . . . focuses on the diligence of the party seeking amendment." *Id.* at 481. "Thus, good cause under Rule 16(b) exists when evidence supporting the proposed amendment would not have been discovered in the exercise of reasonable diligence until after the amendment deadline had passed." *Id.*

The court finds that Benedict has established good cause for the amendment and that justice requires permitting the amendment. The delays in discovery of the claims were not

Benedict's fault and not attributable to a lack of diligence on its part. For example, Benedict indicated that NCS delayed its production in Response to Plaintiff's Second Request for Production for than more than three weeks beyond the 30 days afforded by the rules, with Benedict's consent on NCS counsel's representations that NCS required additional time to gather the requested documents. Benedict contends that NCS counsel specifically represented in a phone conversation that NCS personnel were "working on Saturday" to ensure production by the following Monday. When produced, the entire production was three pages, one of which was a cover sheet, in response to Request No. 27. NCS objected to, and failed to produce any documents in response to, every other request. In light of such types of delay, the court finds without merit NCS's argument that Benedict amendment comes too late.

Furthermore, the defendants will not suffer any prejudice from the amendment. The court grants Benedict's motion to amend its complaint to include the additional and modified claims and additional defendants. Benedict is instructed to docket its amended complaint by November 20, 2009.

B.     NCS's Motion for Judgment on the Pleadings and for Partial Summary Judgment as to Fraud Claims, Punitive Damages and Which Writing Constitutes the Contract

The court having granted Benedict's motion to amend its complaint, finds moot NCS's Motions for Judgment on the Pleadings and Partial Summary Judgment as to the claim for fraud. The court denies NCS's Motion for Judgment on the Pleadings and Partial

Summary Judgment as to the claim for punitive damages as premature.

NCS's motion also includes a request for the court to determine which writing constitutes the contract. Summary judgment is only appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). NCS claims that Ford did not have authority to sign the addendum that Benedict contends formed a part of the contract. Benedict retorts by pointing to Ford's testimony that Rehkow and Snyder instructed him to sign the addendum for the precise reason that NCS could later claim he lacked the authority to sign it. This disagreement concerning Ford's authority to execute the addendum presents a genuine issue of material fact that is inappropriate for determination by the court on summary judgment. Therefore, NCS's motion as to which writings constitute the contract is denied.

C.     Benedict's Motion to Compel

Benedict has moved to compel NCS to provide amended and supplemental responses to its Interrogatories and Request for Production. Benedict cites deficiencies in NCS's answers to the following general categories of documents: 1) requests for the production of tax and financial documents and NCS's client list, 2) requests for corporate documents, 3) general reference to all documents produced, and 4) requests for any electronic messages sent or received by NCS. Benedict maintains that it has a right to this information in order to prove its claims.

Pursuant to Fed. R. Civ. P. 34, any party may serve on any other party a request for documents containing any matter, not privileged, that is relevant to the claim or defense of any party. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. Specifically, "relevant evidence" is defined to mean evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. The trial court has broad discretion in determination of relevance for discovery purposes. *Watson v. Lowcountry Red Cross*, 974 F.2d 482 (4th Cir. 1992).

1)      Requests for Production of Tax, Financial Documents and Client Lists

Benedict argues it is entitled to NCS's tax statements and client list in order to support its fraud and fraud in the inducement claims. NCS argues that this information is not a proper area of discovery. The court denies without prejudice Benedict's motion to compel NCS's tax documents and client lists at this time. Should discovery bear out Benedict's fraud allegations, the court grants leave to refile the motion to compel NCS's tax documents and clients lists.

2)      Requests for Corporate Documents

NCS claims that it has complied with Benedict's request concerning corporate documents as written. At the hearing, there appeared to be a disconnect between what Benedict's counsel intended the requested corporate documents to cover and what NCS's

counsel understood was being sought. Therefore, the court directs Benedict to reissue a discovery request detailing with greater precision the documents sought. NCS is ordered to produce those corporate documents which are not otherwise covered by a privilege.

### 3) General Reference to All Documents Produced

Benedict complains that NCS's Responses to Benedict's Document Requests are inadequate and unresponsive, because, with only a few exceptions, they cite to the entirety of the document production, 1 through 4,954 without correlation to the interrogatories and requests for production. NCS claims that the documents were gathered and produced as they are kept in the usual course of business, citing to Fed. R. Civ. P. 34 which only requires the documents be produced as they are kept in the usual course of business or organized and labeled as they correspond to the categories in the request.

The court rejects NCS's argument that its production of nearly 5,000 pages of documents were provided "as they are kept in the usual course of business" and therefore need not be organized and labeled to correspond to the categories in Benedict's discovery requests. According to NCS's representations at the hearing and its brief, the documents were not provided as in the usual course of its business, but printed out from its database, copied, Bates numbered, converted to pdf format and then produced—with the information in the charts neutered of their derivation and metadata, and lacking the necessary identifiers to enable Benedict to make sense of the information provided.

The traditional rationale for holding the responding party responsible for any difficulties in retrieving relevant information is because it chose its own computerized record-keeping system. *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421, 429 (S.D.N.Y. 2002). Therefore, translating information obtained from a computer database into a reasonably understandable form is a necessary and foreseeable burden on the responding party. 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 37A.30[2] (3d ed. 2005). A party that selects its own information recording system and expects to be able to access information for business purposes will be obligated to produce that same information in discovery. *Id.* at ¶ 37A.31[4]. The court likewise rejects NCS's argument that the burden of analyzing and categorizing NCS's document production is one that falls on Benedict exclusively.

As the following representative excerpts of Rehkow's deposition demonstrate, he as NCS's 30(b)(6) witness, did not provide much assistance in interpreting the discovery, either:

> Q. All right. So – but I'm asking about the cash to school.
> A. Well, the cash should tie into our progress report.
> Q. Okay.
> A. Unfortunately the progress report and the Bates number's in alphabetical order and it's not in numerical order, so I couldn't tie these numbers into the progress report.
> Q. Okay.
> A. And there's – there's no names on this.

(Rehkow depo p. 139, ll. 22 – p. 140, ll. 8).

> Q. And by your own definition that would have been "Cash to School," not "Arrangement Made to School"?
> A. Well, that's what this report says.
> Q. Okay. But we don't have anything but this report?

A.   Unfortunately I was unable to, during the break, match these numbers to the progress report.

Q.   Okay.

A.   The progress report is available online.  You can print it out.

(Rehkow depo p. 142, ll. 14 – p. 143, ll. 25).

Q.   Next Exhibit 20, I'd ask you to look at it and tell me when you're ready for questions.

A.   Okay.

Q.   And what is this document?

A.   This is a spreadsheet prepared by Lynn Goldberg showing various claims that Benedict was either paid in full or paid to NCS, or if no documents were present, when –  then the client went online to update balance and settle claim. And then it's got the amounts listed. These are loan numbers in the middle here from Benedict.

Q.   All right.  So NCS was representing that this was an accurate compilation of whatever information was on it?

A.   Well, it certainly – it was prepared by Lynn Goldberg, and, again, I was not asked to familiarize myself with this particular document.

Q.   What did you familiarize yourself with, sir?

A.   Let me find the notice.  Okay.  Development of the agreement, plaintiff.  The terms of the agreement, the back of the order form.

Q.   All right.

A.   Basis for damages alleged by NCS in this matter.

Q.   All right, sir.  Let's stop right there.  The document that I've just handed out, Exhibit 20, are you contending under oath that this document has nothing to do with the basis for damages alleged by NCS in this matter?  Yes or no, and then you can explain.

A.   I don't believe this has do with – I mean, I can't tell from this document.

Q.   Sir, you were noticed to – and represented as a – the individual –

A.   Right.

Q.   – who represents NCS to discuss the basis for damages alleged by NCS in this matter. You have said – you got – you don't know a fundamental issue – fundamental piece of information about this document, and then you said, it's because you did not prepare because it is not within the scope.

A.   Correct.

Q.   I am asking you for a yes or no, and then you may explain.  Does this document have anything to do with the basis for damages alleged by NCS in this matter?  Yes or no.

A.   I don't believe so.

9

Q. All right. Is that a no?

A. I don't know.

Q. Is it the NCS position? Yes or no.

A. I don't know.

Counsel for Plaintiff: [Counsel], I'm going to have to do something here.

Counsel for Defendant: He's saying he doesn't know.

Counsel for Plaintiff: He doesn't know. So he is not the correct individual to discuss this document under the 30(b)(6)?

Counsel for Defendant: This document wasn't designated nor is any of the documents in production designated. There are thousands of documents that relate to National Credit Systems' basis for the damages in this case.

Counsel for Plaintiff: Are you saying that he doesn't – this is not part of – this is not related to the basis of damages? That's what I'm – that's what I'm hearing. That's what is on the record.

Counsel for Plaintiff:

Q. Let's go back to Exhibit 19, this document, and let's go over this one again.

A. All right.

Q. Again, I ask you, sir, is this document a basis for the damages alleged by NCS in this matter? Yes or no and you may explain.

A. I don't know.

Q. Sir, were you noticed that you were to be – represent the company in discussing the basis for the damages alleged by NCS in this matter?

A. Yes.

Q. Did you prepare to discuss the basis for damages alleged by NCS in this matter?

A. Yes.

Q. Why do you not know whether this document is one of the bases for the damages alleged by NCS in this matter?

A. Well, I can't tell from this document whether this is phase one collections or phase two collections.

Q. All right, sir. And how do you expect Benedict to be able to know whether this is related to phase one, phase two or anything to do with damages?

A. Well, there's a report that was produced –

Q. Sir, I'm talking being about this document.

Counsel for Defendant: He's trying to answer the question. He's –

Counsel for Plaintiff:

Q. Excuse me. Go ahead and answer.

A. I was told that there was upwards of 20 thousand – 20 million dollars in ACM, second part collection service.

Q. Who told you that?

A. There's a report somewhere.

(Rehkow depo p. 174, ll. 25 – p. 179, ll. 11).

Q. What would – what is your view of the date that this addendum was signed?

A. What's the question?

Q.  Do you agree that July 12th, 2007, was the date that these signatures were affixed?

A. Well, I really can't answer that.  I didn't sign it, but they put that date there.

Q. Okay.  Do you have any reason to believe it wasn't signed on July 12th, 2007?

A. No.

Q. And would you agree that normally when an individual affixes a date to his signature, that is the date they sign it?

A. I don't – I'm not going to agree with that.  I don't know that to be a fact, no.

(Rehkow depo p. 72, ll. 25 – p. 73, ll. 14).

The court rejects NCS's claim that the requests were overly broad, unduly burdensome and not calculated to lead to the discovery of admissible evidence.  As referenced in the Advisory Committee Notes to Rule 34, the Supreme Court has already delineated the required specificity of requests for production:

> We see no reason why all such books, papers, and correspondence which related to the subject of inquiry, and were described with reasonable detail, should not be called for and the company directed to produce them. Otherwise the [requesting party] would be compelled to designate each particular paper which is desired, which presupposes an accurate knowledge of such papers, which the tribunal desiring the papers would probably rarely, if ever, have.

Consolidated Rendering Co. v. State of Vermont, 207 U.S. 541, 544 (1908).

Furthermore, the fact that the information sought might already be in the possession of the requesting party or obtainable from another source is not a bar to discovery of relevant information.  See, e.g., Fort Washington Resources, Inc. v. Tannen, 153 F.R.D. 78, 79 (E.D.

11

Pa. 1994)(defendant had to produce requested documents regardless of fact that they were accessible to plaintiff).

Having reviewed the 30(b)(6) deposition of Rehkow, heard the arguments of counsel at the hearing, and considered the arguments presented in the briefs, the court finds NCS's position untenable. Contrary to defense counsel's argument, the rules of civil procedure and evidence do not permit a party to dump on opposing counsel a load of documents—in this case, some 5,000—without a correlation to the requesting party's discovery request, then produce an unresponsive, evasive or otherwise obfuscating 30(b)(6) witness who fails to provide an explanation of the discovery produced, and then claim that it was the requesting party's fault for not making proper inquiries in discovery.

A primer on the American adversary system appears in order. Our system of dispute resolution and justice rests on the "unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice." *United States v. Shaffer Equipment Co.*, 11 F.3d 450, 457 (4th Cir. 1993). It is a process dependent on:

> the adversarial presentation of evidence, precedent and custom, and argument
> to reasoned conclusions—all directed with unwavering effort to what, in good
> faith, is believed to be true on matters material to the disposition. Even the
> slightest accommodation of deceit or a lack of candor in any material respect
> quickly erodes the validity of the process. As soon as the process falters in that
> respect, the people are then justified in abandoning support for the system in
> favor of one where honesty is preeminent.

*Id.* The court does not view favorably any attempt "to play fast and loose" with our judicial system. *United States v. Levasseur*, 846 F.2d 786, 792 (1st Cir.1988).

Too often a lawyer loses sight of his primary responsibility as an officer of the court. *Wagner v. Williford*, 804 F2d 1012, 1017 (7th Cir. 1986). Zealous advocacy can lead to obstruction where it impedes the court's search for truth. Counsel has a basic ethical obligation to be "scrupulously candid and truthful" in his representations to the court. More practically, if a lawyer is to be an effective advocate, where his reputation for veracity is suspect, he will lack the confidence of the court in matters serving his client. *United States v. Thoreen*, 653 F.2d 1332 (Wash. App. 1981). This court concurs with the proposition that the judicial system can provide "no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end." *Shaffer*, 11 F.3d at 457–458.

It does not appear that truth-seeking has been the overriding goal of NCS or its counsel in this case. The court is not persuaded by NCS's arguments opposing production and finds that Benedict is entitled to much of the discovery it seeks. Therefore, the court grants plaintiff's motion to compel and directs defendants to completely and specifically answer Benedict Interrogatory Nos. 2, 7, 8, 9, 10, and 14, without referencing Benedict to the NCS's Answer and Counterclaim, which non-answers violate Fed. R. Civ. P. 33(b)(3) as they provide no answer at all. NCS is also ordered to immediately produce those documents—and only those documents—that are responsive to each of Benedict's First Set of Requests for Production Nos. 1–16 and 21–23. NCS's production must be individualized to respond to each of the particularized requests, with the requested documents organized and

labeled to correspond with each request. Any request which appears in the form of an interrogatory shall be responded to with an answer, as if the request were stated under Rule 33.

Finally, the court notes that Rehkow appeared to acknowledge in his deposition that a report could be generated with the proper identifiers to reveal what it is that Benedict seeks: who paid how much when to whom and where the funds ended up. The court directs that such a report be produced in a form comprehensible to Benedict. The parties are encouraged to work together to determine the format of the production. If the parties cannot agree on the format, the court is available to determine the reasonableness of each side's position and to assess costs, if necessary.

NCS is also ordered to provide to the court and to Benedict, a faithful electronic copy of the database of the accounts forwarded by Benedict with the historical and current metadata intact, including all collections information relevant to the accounts —who paid how much when to whom and where the funds ended up. If any special software application is required to run the database copy, NCS is directed to provide a copy of it to the court and to Benedict. Should the court determine an accounting is proper, the database will be available for inspection.

NCS's complete production and answers must be served on Benedict no later than December 7, 2009. Finally, the court reminds counsel of Rule 26(g), which provides, on pain of sanctions, that the signature of the attorney or party on responses to discovery constitutes

a certification that to the best of the signer's knowledge, information and belief, formed after a reasonable inquiry, the disclosure is complete and correct as of the time it is made. As the court noted during the hearing, it is insufficient to claim that "this is what my client tells me."

A final word on the court's review of Rehkow's deposition. Rehkow stated that he "did not understand the question" more than 20 times, and his counsel lodged no fewer than 55 objections in the course of the deposition. As the South Carolina Supreme Court has noted, "in depositions attorneys may face the greatest conflict between their obligations to the court and opposing counsel under Rule 3.4, and their obligations to their own client under Rule 1.3." *In re Anonymous Member of South Carolina Bar*, 552 S.E.2d 10 (S.C. 2001). The underlying purpose of a deposition is to find out what a witness knows. It is meant to be a "question-and-answer conversation between the deposing lawyer and the witness." *Id.* A witness's attorney "cannot object to a question just because the attorney does not understand the question." *Id.* Furthermore, it is improper for counsel to lodge objection after objection that do not matter, but which appear solely calculated to disrupt deposing counsel's train of thought and command of the deposition.

4)      Requests for any electronic messages sent or received by NCS

In its Document Request No. 16, Benedict seeks "electronic mail, text messages or any other electronic messages sent or received" by the identified NCS individuals, to which NCS produced a total of eleven emails. In light of the relationship between the parties, particularly its length, the nature of negotiations, and the continuing contractual relationship,

it is difficult for this court to believe that NCS has in its possession only eleven emails that satisfy Benedict's valid request for all electronic messages, especially in light of Rehkow's deposition testimony in which he implicitly conceded email was a primary form of communication among NCS employees, agents and clients. For example, NCS Regional Sales Manager Eric Snyder wrote in an email that as of October 24, 2007, there were some "126 e-mails between Benedict College, the consulting firm, Radian, Mrs. Walker, Mrs. Roberts, Darren Ford" and himself (Benedict_0784).

It is also difficult to understand how NCS does not have in its possession basic corporate documents requested for by Benedict. The fact that these documents must be filed with New York's Secretary of State gives rise to a presumption that NCS would have copies of the documents in its possession. The court is not persuaded by the argument that Benedict has the same ability as NCS to obtain these documents and therefore NCS is not obligated to produce them.

The court orders that the President of NCS, Christopher Rehkow, direct that a diligent search be made of the company's records for any and all documents responsive to the above named requests and certify to the court by affidavit that such search has been conducted and provide all documents requested or certify that the documents are unable to be located, have been destroyed, or both, giving the date and reason any such documents were destroyed or never existed. Said affidavit will be under oath, notarized, and under penalty for contempt for filing a false document with a United States District Court. The affidavit should state as

follows:

> I, Christopher Rehkow, President of National Credit Systems, Inc., have been fully advised of the penalties for contempt of court and/or making a false statement to a United States District Court, and I have been further advised that there is a maximum penalty of six months incarceration in a federal penal facility for such contempt. Having been advised therein, I certify that under my supervision [person in charge of that search] has made a complete search of all corporate records and that we [are] [are not] able to locate the following documents requested in the underlying litigation. [Account for each document]. I hereby submit this information with the full knowledge that it is material to the underlying civil action and with the further knowledge that this Affidavit is submitted under penalty of perjury for obstruction of justice and submitting a false statement to a United States District Court.

Said affidavit is to be filed with the court no later than December 7, 2009.

D.      Benedict and NCS's Cross-motions for Preliminary Injunction

Benedict has also requested a preliminary injunction against NCS to prevent it from carrying out further collection activities against its debtors. Benedict maintains that it sent NCS a request to stop all collection activities on June 9, 2008 and received an acknowledgment that NCS had ceased its collection efforts that same day. However, NCS argued at the hearing that, under the contract, it is still entitled to collect on those accounts forwarded to it by Benedict and that no such request was ever received or responded to. NCS requested that if a preliminary injunction is issued against it, that an injunction against Benedict also be issued to escrow any monies received from those accounts.

The court heard from the parties at length about the right to the collection efforts by NCS and Benedict and has considered the four factors under *Real Truth About Obama v. Federal Election Commission*, 575 F.3d 342 (4th Cir. 2009), and *Winter v. Natural*

*Resources Defense Council Inc*., ___ U.S. ___, 129 S.Ct 365 (2008). To obtain a preliminary injunction, a party must establish: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Real Truth About Obama,* 575 F.3d at 346.

The court finds that a preliminary injunction is appropriate under the circumstances of this case. Benedict has outlined a disturbing set of facts that, if true, places the loan accounts of some 3,300 students at issue. To wit, Benedict has pointed to evidence that suggests NCS's fulfillment of its discovery obligations is questionable, its lack of basic corporate documents and regular business documents (e.g., emails, receipt and mailing of fax correspondence, etc.) perplexing, and its cooperation in litigation and financial transparency less-than-ideal. Without an injunction, it is possible that both Benedict and NCS would attempt to collect on the same student's account. Without an injunction, the status of the students' loan accounts is in flux, their creditworthiness at risk, and Benedict's financial interest in the accounts and its ongoing relationships with its students in jeopardy. The court finds that Benedict has demonstrated a likelihood of success on the merits of this action, that the balance of equities tips in its favor, and the public interest favors an injunction pending a final resolution of the parties' rights in the accounts, without which it would suffer irreparable harm.

NCS is ordered to cease all collection efforts for any account forwarded to it by Benedict. Collection efforts include any and all services, including any actions contracted for under either version of the contract, up to and including the actual collection of money from debtors. NCS is likewise ordered to escrow any monies received since October 20, 2009 from its collection efforts on the Benedict loan accounts, including any money that is sent by Benedict debtors, including automatic payments directly from debtor checking accounts despite NCS's termination of activity. Pursuant to its agreement, Benedict is also ordered to escrow any monies received since October 20, 2009 from its collection efforts on the contracted accounts. Each party will be required to provide the court with an accounting of the escrow accounts at a future date.

E.     Benedict's Motion for Independent Accounting

Benedict also seeks an order directing NCS to produce an accounting of all amounts collected from the portfolio of accounts it provided to NCS. Benedict suggests that an accounting is required because 1) NCS has allegedly been surreptitiously collecting on the accounts for more than a year after Benedict directed NCS to cease its collection efforts, 2) none of these monies collected by NCS are reflected in any document produced by NCS in discovery, and 3) NCS may be improperly claiming damages on accounts from which it actually received payments. Benedict requests that the accounting be performed and certified by an independent, qualified accountant at NCS's expense. NCS opposes the accounting as an improper and untimely means of conducting discovery after the discovery period lapsed.

In light of the court's foregoing directive to NCS to provide to the court and to Benedict a faithful electronic copy of the database of the accounts forwarded by Benedict with the historical and current metadata intact, the court finds the request for an independent accounting unnecessary at this time. However, if the court is presented with evidence that NCS has not complied with the directives herein, the court will revisit Benedict's request for an accounting, with costs to be assessed against NCS. The court takes under advisement Benedict's request for attorneys' fees and costs associated with prosecuting its motions.

III.    Conclusion

For the foregoing reasons, the court grants Benedict's Motion to Amend the Complaint to add defendants and claims for fraud and civil conspiracy [dkt. # 32]; deems moot NCS's Motions for Judgment on the Pleadings and Partial Summary Judgment as to the claim for fraud [in dkt. #30 and # 45]; denies NCS's Motion for Judgment on the Pleadings and Partial Summary Judgment as to the claim for Punitive Damages and Which Writing Constitutes the Contract [in dkt. #30 and # 45]; grants in part and denies in part Benedict's Motion to Compel [dkt. # 26]; grants in part Benedict's Motion for Preliminary Injunction [dkt. # 27]; grants in part NCS's Cross Motion for Preliminary Injunction filed [dkt. # 38]; and denies at this time Benedict's Motion for Independent Accounting [dkt. # 28].

The court will extend deadlines in the scheduling order to accommodate the production of discovery compelled and discovery relevant to the newly-asserted claims, including another 30(b)(6) deposition of NCS if Benedict deems proper. A separate scheduling order will issue.

IT IS SO ORDERED.

November 16, 2009
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge